# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

FILED
U.S. DIST COURT
MIDDLE DIST. OF LA

2003 FEB 19 P 4: 47

SIGN
BY DEPUTY CLERK

|  |  |
|---|---|
| FRANCES UNGER, Individually and On Behalf of All Others Similarly Situated, | : : : |
| Plaintiff, | : : |
| v. | : : |
| AMEDISYS, INC., WILLIAM F. BORNE, LARRY GRAHAM and JOHN M. JOFFRION, | : : : |
| Defendants. | : : : |

Case No. 01-CV-703
Judge James J. Brady

## PLAINTIFFS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION

| INITIALS | DOCKET# |
|---|---|
| mt | 90 |

JJB

## I.   PRELIMINARY STATEMENT

Lead Plaintiffs William Patterson and Gordon Ellis, by and through their undersigned attorneys, hereby submit this memorandum of law in support of their motion for an Order certifying this action as a class action, certifying the moving Lead Plaintiffs as class representatives, and certifying the undersigned counsel as class counsel. Plaintiffs seek to certify and represent a class consisting of all persons and entities who purchased the common stock of Amedisys, Inc. ("Amedisys" or the "Company") during the period November 15, 2000, through June 13, 2001, inclusive (the "Class Period") who were damaged (the "Class") by Defendants' alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Excluded from the proposed Class are all Defendants, including the Company and its subsidiaries, affiliates, directors, senior officers, successors or assigns and any of the members or heirs of Defendants' immediate families. The proposed Class satisfies the numerosity, commonality, typicality and adequacy of representation requirements of Fed. R. Civ. P. 23(a)(1)-(4) and the predominance and superiority requirements of Fed. R. Civ. P. 23(b)(3).

## II.  STATEMENT OF FACTS

Amedisys purports to offer home health care, nursing, home infusion therapy and ambulatory surgery services. Compl. ¶ 9.[1] Approximately 90 percent of the Company's revenue is derived from Medicare. Compl. ¶ 34. On October 1, 2000, Medicare began implementation of its Prospective Payment System, under which Medicare estimates the total amount it will pay Amedisys for services rendered to patients. Compl. ¶¶ 28, 35. Under PPS, Medicare pays a

---

[1]    References taking the form "Compl. ¶__" are to Plaintiffs' Consolidated Amended Class Action Complaint, Unger v. Amedisys, Inc., No. 01-CV-703 (M.D. LA. filed Feb. 4, 2002).

1

substantial portion of the total estimated amount up front, and the remainder upon the completion

of the particular treatment episode. Compl. ¶ 28. In cases where the total amount ultimately

owed by Medicare is less than the amount of the up-front payment provided to Amedisys, the

amount of the over-payment is refunded to Medicare.[2]  Throughout the Class Period, Defendants

manipulated PPS to their advantage. Utilizing the misstatements and omissions alleged in the

Complaint, Defendants misled the market as a whole by overstating Amedisys' revenue, which in

turn inflated the price paid for shares of the Company's stock by unsuspecting investors, such as

the Lead Plaintiffs.

Specificially, Amedisys improperly recognized net services revenue in violation of

Generally Accepted Accounting Principles ("GAAP") in order to inflate the public appearance of

revenue and capital. Compl. ¶ 2. This manipulation created the appearance that the Company

was "strengthening" its balance sheet and improving its operating results, thus allowing

Defendants to expand the Company's market share and further increase revenues through

expansion. *Id.*

As the Complaint explains in detail, Defendants intentionally manipulated PPS by

affirmatively instructing its employees to indicate on the Medicare forms that patients would

require more visits than were actually required. Compl. ¶¶ 36-48. The instructions were made

consistently and on a company-wide basis. *Id.* at ¶¶ 37-43. The misrepresentations caused

Medicare to increase the amounts of its disbursements to Defendants, increasing the immediate

revenues, cash, earnings and net income reported by the Company. *Id.* at ¶ 36.

---

[2]    <u>See</u> Defendants' Memorandum In Support Of Motion To Dismiss, p 2.

Defendants not only directed employees to overstate patient care needs, but chose not to change the policy, even after they were put on notice that the plan had the effect of fraudulently increasing revenue. Compl. ¶ 38. Through the policy of booking revenues "on the front end" before they were received, Defendants materially overstated the Company's income, revenue and other key performance indicators, upon which the market relied, to its detriment.

Defendants' manipulations were further exacerbated by their publicly issued statements touting the Company's performance. For example, the Class Period begins on November 15, 2000, with the Company's announcement of its third quarter results. In its press release, Amedisys advised investors that its improved performance was attributable to the successful implementation of the Prospective Payment System and encouraged investors with statements such as the following: "We believe Amedisys can take advantage of both internal and external growth opportunities in an improved industry environment, and *management is committed to the pursuit* of strategies which will serve society and our shareholders well." (Emphasis supplied). *Id.* at ¶ 48.

On March 1, 2001, Amedisys issued a press release over the <u>PR Newswire</u> announcing its financial results for the quarter and year ended December 31, 2000. Compl. ¶ 54. Defendant Borne was quoted as stating:

> We are very pleased to report an impressive turnaround in operating profitability during the fourth quarter of 2000. . . . The implementation of Medicare's new Prospective Payment System (PPS) on October 1, 2000, combined with management's successful efforts to position Amedisys as a cost-efficient provider of home health nursing services, allowed the Company to reduce its net loss from continuing operations by more than 70% for the year ended December 31, 2000.

3

Compl. ¶ 54.

On March 19, 2001, the Company filed its Form 10-K for the quarter and year ended

December 31, 2000, reporting substantially the same financial information reported in the March

1, 2000 press release.  Compl. ¶ 55.

Throughout the remainder of the Class Period, Defendants issued press releases and other

public statements, touting the Company's performance, strong revenue and income, and

successful implementation of PPS.  These statements were repeated in and supplemented by

filings with the SEC.  The market listened.  On June 8, 2001, Amedisys' common stock reached

a Class Period high of $10.75.

The information provided by the Company referenced above was materially false and

misleading and omitted material facts when made in that Defendants knew, or recklessly

disregarded that the Company's reported revenue and earnings were attributable to the improper

recognition of revenue in violation of Generally Accepted Accounting Principles ("GAAP") and

SEC rules.  Compl. ¶¶ 61-62.  During the Class Period, the Company had knowledge, or

recklessly disregarded, that these statements were false and misleading because the Company

lacked a system of internal controls with which to properly ensure that the reported net services

revenue, earnings, and net income were materially correct.  Compl. ¶¶ 61-62.

In connection with implementing the Medicare Prospective Payment System ("PPS") in

October 1, 2001, Amedisys improperly recognized net services revenue for the fourth quarter of

2000 and the first quarter of 2001 in violation of GAAP.  Compl. ¶ 62.  Indeed, the Company

materially overstated net services revenue by approximately $6.6 million.  Compl. ¶ 62.  As a

4

result of the restatement, the Company was actually unprofitable, even though it had previously reported strong financial results. Compl. ¶ 62.

Defendants falsely assured investors that the Medicare PPS provided positive revenue and earnings for the Company. Compl. ¶ 62. In fact, had defendants properly applied PPS, Amedisys would have reported significantly reduced revenues and losses for each of the fourth quarter of 2000 and first quarter of 2001. Compl. ¶ 62.

|  | 4th Quarter 2000 | | 1st Quarter 2001 | |
|---|---|---|---|---|
|  | **As Reported** | **As Restated** | **As Reported** | **As Restated** |
| Revenues | $23.5 M | $19.4 M | $23.4 M | $22.2M |
| Net Income | $3.1 M | ($130,000) | $2.4 M | ($409,000) |

Compl. ¶ 66.

Not long after Mr. Patterson elected to invest in Amedisys, on June 13, 2001 the Company issued a press release admitting that it overstated net services revenue for the quarters ended December 31, 2000 and March 31, 2001. Compl. ¶ 63. The Company reported, in relevant part:

> The implementation of the Prospective Payment System ("PPS") on October 1, 2000 made significant changes to the reimbursement methodology for home health nursing companies, necessitating changes to systems processing provider and patient-specific claims for both the intermediary and the individual home health provider. The Company noted certain discrepancies in these systems which had the effect of overstating net services revenues. At this time, the Company is continuing to verify all the data to determine the overall impact upon previously reported revenues. While the Company has not yet determined the exact amount, it believes the resulting negative adjustment to net service revenue could range between $4 and $7 million, to be allocated between the fourth quarter of 2000 and the first quarter of 2001. The Company expects to report actual adjustments as soon as possible.

Compl. ¶ 63.

As a result of this revelation, the Company's stock price plummeted almost 60 percent to close at $4.10 per share on June 13, 2001, far from its closing price of $9.92 per share on June 12, 2001.  Compl. ¶ 64.

On July 17, 2001, Amedisys issued a press release detailing the impact of the previously announced false financial results.  Compl. ¶ 65.  The Company reported, in relevant part:

> The Company, with the assistance of the Company's external auditing firm, has completed a review of all Medicare patients served and has quantified the impact of the net service revenue overstatement upon its previously reported operating results.  The decrease in revenue for the six months ended March 31, 2001 totaled approximately $6.6 million and will be partially offset by a reversal of $900,000 in incentive compensation, resulting in a net negative adjustment to operating income of $5.7 million.  Of this $5.7 million, $2.6 million is attributable to the fourth quarter of 2000 and $1.3 million is attributable to the first quarter of 2001.
>
> After taking the restatement into account, Amedisys will report an operating loss before income taxes of special items of $130,000 on revenues of approximately $19.4 million for the quarter ended March 31, 2000.  For the quarter ended March 31, 2001, the Company will report an operating loss before income taxes and special items of $409,000 on revenues of approximately $22.2 million.  For the twelve months ended December 31, 2000, the Company will report an operating loss before income taxes and special items of $4.3 million on revenues of approximately $88.2 million.

Compl. ¶ 65.

Contrary to Defendants' representations and contrary to GAAP and SEC rules, during the Class Period, Amedisys improperly recognized revenue, according to the information Amedisys had at the time the revenue was recognized, the Company had not earned.  Compl. ¶¶ 56, 61, 62.  Due to these accounting improprieties, the Company presented its financial results and statements in a manner that violated GAAP, and fundamental accounting principles.  Compl. ¶¶ 56, 61, 62.

Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts

to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed. Compl. ¶ 90.

Defendants Borne, Graham and Joffrion caused Amedisys to engage in irregular accounting practices, and in turn caused Amedisys to report artificially inflated financial results. Compl. ¶ 83. The Individual Defendants knowingly, or in reckless disregard for the truth, caused Amedisys to engage in accounting irregularities. Compl. ¶ 83.

Amedisys, acting through its officers, Borne, Graham and Joffrion, knowingly or in reckless disregard for the truth, issued to the investing public financial statements, which contained materially false and misleading statements and artificially inflated net services revenue. Compl. ¶ 84. Each Individual Defendant had knowledge of Amedisys' problems and was motivated to conceal such problems. Compl. ¶¶ 84, 94. Each Individual Defendant sought to demonstrate that he could lead the Company successfully and generate the growth expected by the market. Compl. ¶ 67. As a result of defendants' materially false and misleading statements and irregular accounting activities the entire Class acquired Amedisys common stock at inflated prices. Compl. ¶¶ 2, 64.

## III.   **PROCEDURAL HISTORY**

Pending before this Court is a consolidated class action lawsuit brought by purchasers of the common stock of Amedisys, alleging violations of the Exchange Act against Amedisys and certain of its officers and directors.

On August 21, 2001, Frances Unger filed a class action complaint on behalf of herself and all others who purchased the common stock of Amedisys to recover damages caused by Defendants' violation of the federal securities laws.[3] On October 4, 2001, plaintiff Brandon Joseph Bueche filed a complaint on behalf of himself and all other persons who purchased the common stock of Amedisys to recover damages caused by Defendants' violation of the federal

---

[3]      Unger v. Amedisys, Inc., Case No. CV 01-703-D-M1.

securities laws.[4]  Pursuant to this Court's Order, dated October 12, 2001, the cases were consolidated.

Pursuant to the PSLRA, on October 22, 2001, Brandon Bueche, William Patterson, Kenneth Lo, and Gordon and Mary Lou Ellis timely moved this Court to be appointed Lead Plaintiffs in the consolidated action and to approve their selection of lead and liaison counsel. They were appointed to serve as Lead Plaintiffs by Order of this Court dated January 14, 2002.

On February 4, 2002, Plaintiffs filed their Consolidated Amended Class Action Complaint on behalf of on behalf of purchasers of Amedisys common stock between November 15, 2000 through June 13, 2001 (the "Class Period").

The parties engaged in substantial class discovery directed at class certification issues. Defendants served interrogatories and document requests on each of the appointed Lead Plaintiffs and Lead Plaintiffs provided responses to those requests and produced responsive documents.  Certain issues over the scope of that discovery were brought to the Court's attention and resolved by the Court.  Certain issues are still outstanding.  Depositions were taken not only of the remaining Lead Plaintiffs but, at the insistence of defendants, and under order of the Court, of the former Lead Plaintiffs as well.  Plaintiffs served discovery requests on defendants and defendants have produced certain documents.  In addition, documents were produced by certain non-parties.

## IV.    ARGUMENT

### A.    THE PROPOSED CLASS ACTION SATISFIES RULE 23

#### 1.    The Standards Of Review On A Motion For Class Certification

Rule 23(a) sets forth four elements that must be met before a class may be certified:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or

---

[4]    Bueche v. Amedisys, Inc., Case No. CV 01-838-D-M2.

8

defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  Here, each requirement of Rule 23(a) is met.[5]

### 2.    The Class Is So Numerous That Joinder Of All Members Is Impracticable

Rule 23(a)(1) requires that the class be so numerous that joinder of all members is impracticable. Republic Nat'l Bank v. Denton & Anderson Co., 68 F.R.D. 208, 213 (N.D. Tex. 1975). "[I]mpracticality . . . does not mean impossibility but merely difficulty or inconvenience." Id. A plaintiff need not allege the exact number and identity of the Class members, but rather must merely establish that joinder is impracticable through "some evidence or reasonable estimate of the number of purported class members." See Zeidman v. J. Ray McDermott & Co., 651 F.2d 1030, 1038 (5th Cir. 1981) ("The proper focus . . . is not on numbers alone, but on whether joinder of all members is practicable in view of the numerosity of the class and all other relevant factors.") (quoting Philips v. Joint Legislative Committee on Performance & Expenditure Review, 637 F.2d 1014, 1022 (5th Cir. 1981)).

Numerosity cannot be disputed here.  During the Class Period, Amedisys had approximately 5,655,000 shares of common stock outstanding. Compl. ¶19.  The sheer number of Amedisys shareholders makes joinder of all Class members impracticable.  Moreover, more than 5.7 million shares of Amedisys common stock were traded during the Class Period.  See Yahoo/Finance, Table of Historical Trading Data, submitted as Exhibit A to the Declaration of Marjorie A. McKeithen in Support of Plaintiffs' Motion for Class Certification ("McKeithen

---

[5]    When determining whether to certify a class, courts have uniformly held that an inquiry into the merits of a plaintiff's claims is inappropriate. Rather, the focus is simply whether the prerequisites of Rule 23 have been met. See Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177-78 (1974) (quoting Miller v. Mackey Int'l Inc., 452 F. 2d 424, 427-28 (5th Cir. 1971)) ("[I]n determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.").

Declaration"); see also Greenwald v. Integrated Energy, Inc., 102 F.R.D. 65, 68 (S.D. Tex. 1984) (numerosity requirement is satisfied where investors of the company traded millions of shares during the Class Period).[6]  Moreover, in Zeidman, 651 F.2d at 1039, the Court of Appeals expressly approved of the presumption that "any class composed of the sellers of a nationally traded security during a period in which hundreds of thousands or even millions of shares of the security were traded must necessarily be 'so numerous that joinder of all members is impracticable.'" Accordingly, the Court concluded that "the prerequisite expressed in Rule 23(a)(1) is generally assumed to have been met in class action suits involving nationally traded securities." Id. at 1039.  Since Amedisys common stock was nationally traded on the OTC Bulletin Board during the Class Period, under Zeidman, numerosity should be presumed. Compl. ¶ 10.

Furthermore, since Amedisys is actively traded on a national securities market, holders of Amedisys securities likely reside in many states.  Id.  This geographical diversity among potential claimants weighs heavily in favor of class treatment.  See, e.g., Mertz v. Harris, 497 F. Supp. 1134, 1138 (S.D. Tex. 1980).  Joining the thousands of Class members who reside in different states would be extremely burdensome and expensive, and thus impracticable.  Consequently, the "numerosity" element of Rule 23(a) is easily satisfied here.

### 3.    Common Questions Of Law And Fact Exist

Rule 23(a)(2) requires that there be "questions of law or fact common to the class."  "The threshold of 'commonality' is not high."  Jenkins v. Raymark Indus., Inc., 782 F. 2d 468, 472

---

[6]    This Circuit has approved of the certification of classes in actions where the number of potential class members are far less than the potential number here.  See, e.g., Boykin v. Georgia-Pacific Corp., 706 F.2d 1384, 1386 (5th Cir. 1983), cert. denied, 465 U.S. 1006 (1984) (class of 317 individuals sufficient); Cary v. Greyhound Bus Co., 500 F.2d 1372, 1379-81 (5th Cir. 1974) (class of over 40 potential class members sufficient); accord H. Newberg and A. Conte, On Class Actions, § 3.05 at p.3-25 (3rd ed. 1992) ("In light of prevailing precedent, the difficulty inherent in joining as few as 40 class members should raise a presumption that joinder is impracticable, and the plaintiff whose class is that large or larger should meet the test of Rule 23 (a)(1) on that fact alone.").

(5th Cir. 1986); Durrett v. John Deere Co., 150 F.R.D. 555, 558 (N.D. Tex. 1993). Rule 23(a)(2) does not require complete identity of legal claims among the Class members, but only that there be "at least one issue whose resolution will affect all or a significant number of the putative class members." Durrett, 150 F.R.D. at 557-58 (quoting Stewart v. Winter, 669 F.2d 328, 335 (5th Cir. 1982)). "[A] court will normally find commonality where a question of law refers to standardized conduct by defendants towards members of the proposed class." In re AmeriFirst Sec. Litig., 139 F.R.D. 423, 428 (S.D. Fla. 1991).[7]

Here, all claims against the Defendants arise out of the same set of operative facts and are based on common legal theories. Compl. ¶ 20. The Plaintiffs allege that Defendants made uniform misrepresentations to the investing public in, inter alia, Amedisys's filings with the SEC and in its press releases. Defendants' material misrepresentations and omissions artificially inflated the market price of Amedisys's securities, thereby injuring – in exactly the same way – each Class member who purchased those securities. Thus, questions of fact and law common to all members of the proposed Class include: (a) whether the federal securities laws were violated by Defendants' acts; (b) whether statements made by Defendants to the investing public during the Class Period misrepresented or failed to disclose material facts about the business, operations, prospects and financial condition of Amedisys; (c) whether Defendants participated in and pursued the common course of conduct alleged in the Complaint; (d) whether Defendants acted willfully, knowingly, or recklessly in omitting and/or misrepresenting material facts; (e) whether the market price of Amedisys's securities was artificially inflated during the Class Period due to the alleged material omissions and/or misrepresentations; and (f) to what extent the members of the Class have sustained damages, and the proper measure of such damages.

---

[7]     Accord Dura-Bilt Corp. v. Chase Manhattan Corp., 89 F.R.D. 87, 93 (S.D.N.Y. 1981) ("existence, materiality, and character of the alleged misrepresentations and omissions" constitute "common questions").

Proving the existence and nature of material omissions and misleading statements by Defendants are the most important issues in a securities fraud case and as such, will be common to all members of the Class in this action.  Absent Class members necessarily would have to prove identical facts and answer identical legal questions if they pursued their claims individually.  Accordingly, the Lead Plaintiffs satisfy Rule 23(a)(2).

**4.     Plaintiffs' Claims Are Typical
Of Those Of The Class**

Rule 23(a)(3) requires that the claims and defenses of the representative plaintiffs be typical of the claims and defenses of the Class.  The test for typicality, like commonality, is not demanding.  Shipes v. Trinity Indus., 987 F.2d 311, 316 (5th Cir. 1993), cert. denied, 510 U.S. 991 (1993); Durrett, 150 F.R.D. at 558; see Forbush v. J.C. Penney Co., 994 F.2d 1101, 1106 (5th Cir. 1993).

"Typicality" does not mean that the claims of the representative parties must be identical with those of the absent class members.  See Philips, 637 F.2d at 1024.  Rather, the courts of this District have noted that typicality is satisfied where the representative plaintiffs' claims arise out of the same event or course of conduct as the other class members' claims and are based on the same legal theory.  See In re First Republicbank Secs., [1989 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 94,554, at 93,546 (N.D. Aug. 1, Tex.1989) ("Typicality refers to the nature of the claims and not to the specific facts from which the claims arose or relief is sought.") (citations omitted); Kalodner v. Michaels Stores, Inc., 172 F.R.D. 200, 204-05 (N.D.Tex. 1997) ("[h]owever, claims need not be identical.  Courts routinely find that similar legal theories satisfy this requirement even where significant factual distinctions are present") (Internal citations omitted); see also Krogman, et al. v. Sterritt, et al., 202 F.R.D. 467, 472 (N.D. Tex. 2001).

Here, the plaintiffs stand in precisely the same position as the other Class members, since they purchased Amedisys common stock during the Class Period at artificially inflated prices, and were injured as a result of Defendants' misrepresentations and omissions in publicly

disseminated information.   Like other Class members, Plaintiffs purchased Amedisys securities at those inflated prices without knowledge of material facts concerning the true financial and operating condition of Amedisys.  The proof that the Plaintiffs will offer at trial and the legal theories advanced are basic and essential to the claims of all class members.  Accordingly, Plaintiffs' claims are typical of those of the Class.

### 5.    Plaintiffs Will Fairly And Adequately Protect The Interests Of The Class

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."  The standards of Rule 23(a)(4) are met if: (1) the named plaintiffs' interests are not antagonistic to other members of the class; and (2) the named plaintiff, through his attorney, is prepared to prosecute the action vigorously.  See Feinberg v. Hibernia Corp., 1992 U.S. Dist. LEXIS 10872, *20-21 (E.D. La. July 14, 1992).  The Fifth Circuit recently visited the issue of representative adequacy in Berger v. Compaq Computer Corp., 257 F.3d 475, 483 (5th Cir. 2001) ("Berger I"), petition en banc denied, 279 F.3d 313 (2002) ("Berger II").  In Berger I, the Fifth Circuit reviewed the standard for adequacy of representation of plaintiffs, apart from the adequacy of counsel.  While the Fifth Circuit noted a requirement that "class representatives . . . possess a sufficient level of knowledge and understanding to be capable of 'controlling' or 'prosecuting' the litigation," 257 F.3d at 482-83, it acknowledged that class representatives "need not be legal scholars and are entitled to rely on counsel. . ." 257 F.3d at 483.  In Berger II, the Fifth Circuit clarified that, in Berger I, the Circuit was not by virtue of enactment of the PSLRA creating "an additional independent requirement for the adequacy standard for class certification under Federal Rule of Civil Procedure 23. . .," nor did the Circuit change the law ". . . regarding the standard for conducting a Rule 23(a)(4) adequacy inquiry." 279 F.3d at 313.  In fact, the Fifth Circuit stated,

> We have not, however, created an additional requirement under rule 23(a)(4) that, after completing the process of selecting the lead plaintiff and lead counsel, a court may grant class certification only if the putative class representative possesses a certain level of

> experience, expertise, wealth or intellect, or a level of knowledge
> and understanding of the issues, beyond that required by our long-
> established standards for rule 23 adequacy of class representatives.

Id., 279 F.3d at 313-14.

Both prongs of the adequacy test are met here.  No actual or perceived conflict of interest exists between the named plaintiffs as purchasers of Amedisys securities and the absent members of the Class.  As the Fifth Circuit stated in In re Corrugated Container Antitrust Litig., 643 F.2d 195, 208 (5th Cir. 1981), cert. denied, 456 U.S. 998 (1982):

> [S]o long as all class members are united in asserting a common
> right, such as achieving the maximum possible recovery for the
> class, the class interests are not antagonistic for representation
> purposes.

(Citation omitted).

Nothing suggests that Plaintiffs' interests are in any way antagonistic to those of the absent Class members.  In fact, Plaintiffs are victims of the same conduct as all other Class members and are committed to prosecuting claims on behalf of all those similarly situated.  Thus, in order to further their own interests, Plaintiffs will necessarily have to advance the interests of all Class members.  See, e.g.,  In re First Republicbank Secs., (CCH) ¶ 94,554 at 93,548 (deciding adequacy issue and finding class representatives' interests co-extensive with interests of the class).  In fact, Plaintiffs have previously demonstrated that are active and able class representatives by  indicating their interest in pursuing this action through their submission of lead plaintiff papers and completion of certification forms, each of which indicate a willingness to provide testimony at trial.  Plaintiffs also responded to discovery requests, including depositions and interrogatories.

Importantly, as demonstrated below, each of the Lead Plaintiffs also possess the personal characteristics necessary to be appointed class representative.  Thus, the adequacy test is satisfied as are all other elements of Rule 23(a).

a.     **Lead Plaintiffs**

14

**William Patterson**

William Patterson is well qualified to serve as a class representative. He is employed in the field of electrical construction. (Patterson Tr. at p. 9).[8]  He received an associates degree in 1970 (Patterson Tr. at p. 9), went to work in a coal mine and then became an electrician. (Patterson Tr. at p. 10).

Mr. Patterson's investment history consists primarily of repeated annual $2,000 investments in an IRA. (Patterson Tr. at p. 19). He first bought Amedisys stock on June 7, 2001. (Patterson Tr. at p. 28). Mr. Patterson's wife — then an Amedisys employee — initially brought the Company to his attention. (Patterson Tr. at p. 37). He then did his own research to learn more about the Company; Mr. Patterson read charts, news articles and examined traditional key indicators, such as the Company's price to earnings ratio in concluding that Amedisys was a sound investment. (Patterson Tr. at pp. 37, 48). Ultimately, however, Mr. Patterson would learn that this was untrue and that the price earnings ratio on which he relied was a product of Defendants' artificial inflation of the Company's revenues and earnings. See e.g., Compl. ¶ 2.

Mr. Patterson understands that the lawsuit is about Amedisys overstating its financial results and making itself look better than it was. (Patterson Tr. at pp.46-47). As a result, when he made his investment in Amedisys, he spent too much on it. He found out that Amedisys would have to restate some of its financial results on June 13, 2001. (Patterson Tr. at p. 50). He saw the restatement release and understood that the release must have caused the change in the stock price. (Patterson Tr. at p. 51). After he bought more Amedisys stock on June 14, he continued to watch for information on his computer. (Patterson Dep. at p. 66).

In the fall of 2001, Mr. Patterson responded to an Internet communication about Amedisys. (Patterson Tr. at p. 70). The communication informed him that there might have

---

[8]     References taking the form "Patterson Tr. at p. __" are to the Transcript of the Deposition of William J. Patterson, August 26, 2002, annexed to the McKeithen Declaration, Exh F.

15

been some wrongdoing. (Patterson Tr. at. 71). Press releases he saw in the summer and fall of 2001 led him to believe there was a possibility of fraud. (Patterson Tr. at p. 125). He responded to a statutory notice from Stull, Stull & Brody that he discovered through his investigation of the company's alleged wrongdoing and sent an e-mail to that firm. (Patterson Tr. at p. 71). When he responded, he learned that there was a class action and that he was a potential class member. (Patterson Tr. at p. 72).

Mr. Patterson has never been a lead plaintiff before. (Patterson Tr. at pp. 73-74). He understands that a class action is where there is "a group of people who have had a similar grievance, a similar problem" and their claims are combined and handled as one case so that "Court's not tied up with a multitude of cases." (Patterson Tr. at p. 74). He believes that he will learn "a little bit at every step of the process." (Patterson Tr. at pp. 74-75). He understood that at the point his deposition was taken, the case was not very far along, but that he was being deposed because he is a lead plaintiff. (Patterson Tr. at p. 75).

Mr. Patterson has been receiving copies of pleadings. (Patterson Tr. at p.77). He has ben receiving papers and has been reading them and understanding them to the best of his ability. (Patterson Tr. at pp. 77-78). He directs his counsel by listening to what they say, directing their actions the best he can with his knowledge and gut feelings as to what he thinks should be done. (Patterson Tr. at p. 82)  He believes that he understands Amedisys' defense to be that it did not understand the forms and filled them out wrong. (Patterson Tr. at p. 87).

He understood that Amedisys was traded over the counter (Patterson Tr. at p. 89). He understood that Mr. Borne was the CEO of Amedisys. (Patterson Tr. at p. 90). Mr. Patterson believes that Amedisys had done what it did because it hoped that business would catch up to it. He believes that the individual defendants are responsible for the operation of the Company and its honesty. (Patterson Tr. at p. 94).

Mr. Patterson has reviewed the Company's SEC filings. He has learned to access them on his computer through Edgar Online. (Patterson Tr. at p. 96). He understands that if he loses

16

the case, he may be required to pay his share of the costs. (Patterson Tr. at p. 110). He understands that if there is a settlement offer, he will have to review it and make a decision if the class should be subjected to the settlement. (Patterson Tr. at p. 113-114). He explained he has the responsibility to see that the class members do not receive a bunch of coupons in a settlement and believes that the class members should get cash and the lawyers should get the coupons. (Patterson Tr. at pp 114-15.). He understands that he has a responsibility of generally overseeing the case. (Patterson Tr. at p. 115). To oversee it, he intends to "keep [his] eyes and ears open [and] act upon whatever [his] senses say to act upon." (Patterson Tr. at p. 115).

Accordingly, as demonstrated herein, Mr. Patterson is well qualified to serve as a class representative.

### Gordon Ellis

Gordon Ellis is also well qualified to serve as a class representative. Mr. Ellis is employed as an investment advisor representative for New York Life. (Ellis Tr. at pp.15-19).[9] He has been employed with New York Life since approximately 1969. (Ellis Tr. at pp. 15-16). Prior to his employment with New York Life, Mr. Ellis graduated from Lee High School in Baton Rouge in 1962, attended Louisiana State University from 1962 to 1966, and served in the United States Army. (Ellis Tr. at pp. 7-14). Mr. Ellis has obtained the professional designations of Chartered Life Underwriters, or "CLU," and Chartered Financial Consultant, or "CHFC," and he has successfully completed the requirements for the basic life and health insurance license and the license to handle securities products, or "Series 7" licensure.

Mr. Ellis has never served as a lead plaintiff or class representative before. In fact, his only litigation experience, other than possibly being named as a defendant in an automobile accident case, has been as a passive class member in class actions involving a few automobiles that he bought over the years. (Ellis Tr. at pp. 32-33).

---

[9]     References taking the form "Ellis Tr. at p. __" are to the Transcript of the Deposition of Gordon D. Ellis, Jr., August 26, 2002, annexed to the McKeithen Declaration, Exh G.

Mr. Ellis began buying individual stocks approximately three to four years ago. (Ellis Tr. at p. 34). He purchased his Amedisys stock using a "good until cancelled purchase order," which he placed on May 18, 2001, to buy 150 shares of Amedisys whenever the price reached $8.00 a share. The order was actually filled on June 13, 2001. (Ellis Tr. at p. 41). At the time that he placed the order, the stock was trading at $8.30. (Ellis Tr. at pp. 37-38). He believes that he chose the $8.00 purchase price, as opposed to paying the $8.30 that the stock was being offered at on May 18, by looking at Amedisys's 52-week high and 52-week low. (Ellis Tr. at p. 74).

He bought the Amedisys stock because he wanted to purchase some healthcare stock, and he chose Amedisys in particular because he had read about the company in a local paper and knew that it was locally owned. (Ellis Tr. at pp. 65-66). Of course, Mr. Ellis invested in Amedisys to try to make money. (Ellis Tr. at p.156).

After Mr. Ellis's purchase order was filled and he learned that the stock price had fallen, he did research on the internet and called a number posted by the company to try to find out more about the reasons for the decline. (Ellis Tr. at pp. 68 and 79). He believes that he actually made the call to John Joffrion, but that Bill Borne returned his call. (Ellis Tr. at p. 69). Mr. Ellis testified that Mr. Borne went through a lengthy explanation as to what happened that caused the stock to drop. Mr. Ellis remembers that the explanation had something to do with accounting discrepancies, but he does not remember the specific details about the explanation. (Ellis Tr. at p. 70).

Mr. Ellis does remember that there were newspaper articles purporting to explain why the stock price dropped, but that he was disturbed by the reasons given. (Ellis Tr. at p. 72). Mr. Ellis later saw an ad in the paper about Amedisys published by McKeithen, McKeithen, & Bohman law firm and decided to become involved in this lawsuit. (Ellis Tr. at pp. 80, 88 and 90).

Mr. Ellis is aware of the nature of the allegations in the case and the general defenses. He is aware that he has accused William Borne, John Joffrion, and Larry Graham of fraud as part of his lawsuit. (Ellis Tr. at p. 84). He understands that Amedisys receives its revenue from

18

Medicare reimbursement. (Ellis Tr. at p. 67). He is also aware that the lawsuit alleges that the amount of reimbursement or payment from Medicare was overstated in relation to the services that were actually provided. He believes that there was overstatement of services which made Medicare overpay Amedisys, and then an adjustment had to be made after the fact. (Ellis Tr. at p. 86). He believes that the motivation Amedisys may have for overstating the services would be that it would improve their cash flow. (Ellis Tr. at pp. 87-88). When asked what specific SEC rules are alleged to have been violated, his response was "misrepresentation." (Ellis Tr. at p. 128). He believes that Amedisys' defenses to the allegations in this suit include that they did not understand how to properly complete the forms. (Ellis Tr. at pp. 124-125).

Mr. Ellis is also familiar with what a class action is. He described it as a group of individuals who have a "common denominator" and have joined together to recover their damages. (Ellis Tr. at pp. 112-113). He understands that there is an effort to designate him as a class representative. (Ellis Tr. at p. 113). He understands that his duty as a class representative is to represent the interest of class members and to attempt to recover damages for the class members who lost money. (Ellis Tr. at pp. 113-114). He also understands what a fiduciary is and believes that he has a fiduciary obligation in this lawsuit to represent the class. (Ellis Tr. at pp. 114-115). Mr. Ellis knows that the case concerns individuals who purchased stock during a particular time frame – the class period. (Ellis Tr. at p. 89). His understanding is that the class bought stock that was overvalued. (Ellis Tr. at p. 115).

Mr. Ellis also demonstrated a general awareness of persons involved in the litigation. Mr. Ellis was aware that Francis Unger was the first person to file a lawsuit in this particular matter. (Ellis Tr. at p. 94). He was also familiar with Brandon Bueche and even corrected Amedisys attorney James Swanson's pronunciation of Mr. Bueche's name. He understood Mr. Bueche to be a member of the class and knew that he lived in Louisiana. (Ellis Tr. at p. 132). He was also aware that John Joffrion is now deceased. (Ellis Tr. at p. 84).

He knows that he is represented by three law firms in the case--McKeithen, McKeithen, & Bohman and law firms in Seattle and New York (Ellis Tr. at pp. 96-99), and he believes that he could change law firms if chose to. (Ellis Tr. at p. 117).    He believes that he is paying his attorneys by contingency fee. (Ellis Tr. at p. 98). His understanding is that, with a contingency fee, if there is any recovery in the case the costs would come out of the recovery. He believes he could potentially be responsible for some expenses, but he has not been asked to pay any expenses at this point. (Ellis Tr. at p. 99).

Mr. Ellis has had numerous discussions with his attorney, Marjorie McKeithen, throughout the litigation and demonstrated an awareness and general understanding of each phase of the litigation thus far. When asked whether he had spoken with Miss McKeithen more than five times, he replied "sure." (Ellis Tr. at p. 102).

He testified that he has been receiving documents, such as the class action complaint, from his attorneys and reading them. (Ellis Tr. at pp. 125-127). He recalls that the copy of the complaint that he received was a draft. (Ellis Tr. at pp. 130-131). He is also aware that there was investigation in the case and that additional allegations were added to the documents based on that. (Ellis Tr. at p. 180). Mr. Ellis testified that he also received an amended complaint and reviewed it, as well. (Ellis Tr. at p. 150). Mr. Ellis also remembers seeing the motion to appoint Mr. Patterson and himself as lead plaintiffs and the motion for class certification. (Ellis Tr. at pp. 141-144). And, of course, he received and helped provide documents and responses to the discovery propounded on him by the defendants. (Ellis Tr. at pp. 47-48 and 151-153).

Although he did not recall receiving copies of the Judge's rulings in the case (Ellis Tr. at p. 146), Mr. Ellis has had discussions with his attorneys regarding rulings that have taken place so far. He is aware that certain of the lead plaintiffs have been withdrawn by the Court. (Ellis Tr. at p. 179). He is also aware that the Court has ruled that their deposition may be taken, and particularly that his wife was going to be deposed. (Ellis Tr. at pp. 179-180).

Mr. Ellis knows that he is expected to supervise what his attorneys do with respect to any settlement proposals in the case (Ellis Tr. at p. 118), and he is aware that there have been settlement discussions with his lawyers about settling the case.  (Ellis Tr. at p. 106).  When asked how he should decide what amount of money he would get out of any settlement, he answered that it must be based on some percentage of his losses and that the plaintiffs along with his attorneys would decide that.  (Ellis Tr. at p. 138).

Mr. Ellis believes that his lawyers are there to help him determine whether the allegations are all well founded  and that his lawyers have a duty to investigate the claims made in the case. (Ellis Tr. at pp. 124 and 162).

He understands that the process that he is going through right now is to determine class certification.  (Ellis Tr. at pp. 145-146).  He also understands that the Motion for Class Certification is still pending.  (Ellis Tr. at p. 146).  His understanding of what class certification involves is that certain members of the class are certified by the Court to represent the interest of the individuals in the class.  (Ellis Tr. at p. 134).

He also demonstrated an understanding of his role at trial.  He understands that at the trial of the case he would be representing the class along with Mr. Patterson and any other lead plaintiffs.  (Ellis Tr. at p. 137).  He also understands that, at the trial, there would be a determination as to whether the allegations are correct and an assessment of damages.  (Ellis Tr. at p. 137).

Finally, he testified that he believes that, if he and Mr. Patterson cannot agree on how to handle the case, he would probably seek guidance from his attorneys.  (Ellis Tr. at p. 133).

**b.    Counsel**

Here, there can be no doubt that Plaintiffs' counsel will provide vigorous and adequate representation for the Class.  As demonstrated by the firm resumes of Plaintiffs' Counsel (attached as Exhibits B, C and D to the McKeithen Declaration), Plaintiffs are represented by counsel who have outstanding records of accomplishment in the prosecution of securities and

21

other class actions. Indeed, in connection with the United Companies Securities Litigation,[10] this Court determined that Plaintiffs' counsel possess the expertise and ability to represent the Lasky class "in an extremely capable and professional manner." See McKeithen Declaration, Exh. E (discussing the caliber of Plaintiffs' counsel, including Stull, Stull & Brody, Keller Rohrback L.L.P., and McKeithen, McKeithen & Bohman).

## B.    PLAINTIFFS SATISFY THE REQUIREMENTS OF RULE 23(B)(3)

To certify this case as a class action, the Court must find that the action, in addition to meeting the prerequisites of Rule 23(a), satisfies at least one of the three conditions of Rule 23(b). Rule 23(b)(3) provides, in relevant part:

> (b)    An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition: . . .
>
> (3)    the court finds that the questions of law common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Here, Plaintiffs satisfy both the predominance and superiority requirements of Rule 23(b)(3).

### 1.    Common Questions Of Law And Fact Predominate

Rule 23(b)(3) does not require that all questions of law or fact be common; it only requires that the common questions predominate over individual questions. Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997) (emphasis added) ("Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws."); Mullen v. Treasure Chest Casino, LLC et al., 186 F.3d 620, 626-27 (5th Cir. 1999).

"Courts generally focus on the liability issue in deciding whether the predominance requirement is met, and if the liability issue is common to the Class, common questions are held to predominate over individual questions." Dura-Bilt, 89 F.R.D. at 93; Feinberg v. Hibernia

---

[10]    Lasky v. J. Terrell Brown, No. 99-CV-1035-D (M.D. La. 1999).

Corp., 1992 U.S. Dist. LEXIS 10872 at *12 (E.D. La. July 14, 1992).  In the case at bar,

Defendants' liability turns upon issues which are common to the Class, that is, did Defendants

make materially false and misleading statements with the requisite scienter through a uniform

course of conduct to the detriment of all Class members.  Simply put, if Defendants are liable for

this conduct, they are liable to all Class members in a like manner.

Moreover, no significant, let alone predominant, individual issues exist in this case.  In

particular, there are no individual issues of reliance that can be said to preclude class

certification.  Under controlling Supreme Court precedent, the reliance element of plaintiffs'

securities fraud claims is presumed.  See Affiliated Ute Citizens v. United States, 406 U.S. 128,

153-54 (1972) (with respect to nondisclosures, a plaintiff need not prove individual reliance

because proof of the materiality of the concealed fact represents sufficient evidence of a causal

connection between a defendant's conduct and plaintiff's injury to satisfy any reliance

requirement under Section 10(b) and Rule 10b-5); accord Basic Inc. v. Levinson, 485 U.S. 224,

241-47 (1988) (presumption of reliance with respect to material misstatements); Fine v.

American Solar King Corp., 919 F.2d 290, 299 (5th Cir. 1990).[11]

In sum, where, as here, a continuous course of conduct on the part of Defendants is

alleged, the issues of law and fact which flow from that conduct clearly predominate over any

individual issues.  In such circumstances, a class action is not only appropriate, but mandated by

Rule 23.

---

[11]     Likewise, courts have repeatedly rejected the argument that any difference among
class members concerning individual damage issues precludes a determination that common issues
predominate.  See Basic, 485 U.S. at 242; In re First Republicbank Secs., (CCH) ¶ 94,554, at 95,543
n.14.  Individual damages in a securities fraud case can be readily determined by use of a simple
formula applicable to all class members.  Blackie v. Barrack, 524 F.2d 891, 905 (9th Cir. 1975), cert.
denied 429 U.S. 816 (1976).

G:\Docs\AMEDISYS, INC\Class Certification Memorandum - last filed.wpd

**2.    A Class Action Is Superior To Other**
**Available Methods Of Adjudication**

Rule 23(b)(3) also requires that the Court determine whether a class action is superior to other possible methods of fairly and efficiently resolving this controversy. Plaintiffs are confident that the class action device is not only superior to other alternatives for adjudicating the claims presented by the instant action, but is the only practical method of obtaining the fair and efficient disposition of these claims.

Violations of the federal securities laws, such as those alleged here, inflict economic injury on large numbers of geographically dispersed persons. As a result, the cost of pursuing individual litigation against multiple adversaries is often significantly greater than the damages for each individual class member. Thus, the alternatives to a class action are either no recourse for hundreds or thousands of securities holders, or a multiplicity of scattered suits resulting in the inefficient administration of justice. See In re First Republicbank Secs., (CCH) ¶ 94,554, at 93,549. This is precisely "the evil that Rule 23 was designed to prevent." Califano v. Yamasaki, 442 U.S. 682, 690 (1979).

As Judge Barefoot Sanders has remarked, "[a]ny administrative difficulties in handling this class action are preferable to duplicating judicial resources in several individual lawsuits and denying access to the courts for class members." In re First Republicbank Secs., (CCH) ¶ 94,554, at 93,549. This action clearly lies in the mainstream of class actions alleging violations of the securities laws which satisfy the "superiority" requirement of Rule 23(b)(3). See Herbst v. International Tel. & Tel. Corp., 495 F.2d 1308, 1323 (2d Cir. 1974); In re Gulf Oil/Cities Serv. Tender Offer Litig., 112 F.R.D. 383, 389 (S.D.N.Y. 1986).

Moreover, the complexities likely to be encountered in the management of class litigation have been held to be insufficient to defeat class certification in numerous actions indistinguishable from this one. See Mersay v. First Republic Corp., 43 F.R.D. 465, 467-69 (S.D.N.Y. 1968). Such complexities will be no greater here. The proposed Class is clearly

defined. Compl. ¶ 1. Few, if any, difficulties will arise in identifying Class members and in providing notice to them. Furthermore, counsel herein have years of experience in managing class actions. This case presents no novel problems.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully submit that this Court should certify this action as a Class Action, certify Plaintiffs as Class Representatives, and certify counsel as Class Counsel.

DATED: February 19, 2003

Respectfully submitted,

McKEITHEN, McKEITHEN & BOHMAN

By _____
        Marjorie A. McKeithen T/A (#21767)
        Martin S. Bohman (#22005)
        10771 Perkins Road, First Floor
        Baton Rouge, Louisiana 70810
        (225) 766-6500

STULL, STULL & BRODY
Jules Brody
Mark Levine
6 East 45th Street
New York, NY 10017
(212) 687-7230

KELLER ROHRBACK L.L.P.
Lynn Lincoln Sarko
Juli F. Desper
Elizabeth A. Leland
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
(206) 623-1900

**(Plaintiffs' Co-Lead Counsel)**

25

## CERTIFICATE OF SERVICE

Pursuant to the Federal Rules of Civil Procedure, I hereby certify that a true and correct copy of this instrument has been forwarded to all counsel of record, via certified mail, return receipt requested, and/or via facsimile, and/or via U.S. Mail on this 19 day of February, 2003.

MARJORIE A. McKEITHEN

26

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| FRANCES UNGER, Individually and On Behalf of All Others Similarly Situated, | : : : | |
| Plaintiff, | : : | Case No. 01-CV-703 |
| | : | Judge James J. Brady |
| v. | : : | |
| AMEDISYS, INC., WILLIAM F. BORNE, LARRY GRAHAM and JOHN M. JOFFRION, | : : : | |
| Defendants. | : : : | |

**DECLARATION OF MARJORIE A. McKEITHEN IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR CLASS CERTIFICATION**

I, Marjorie A. McKeithen, declare:

1.      I am an attorney at law duly licensed to practice in the State of Louisiana.  I am a partner in the Baton Rouge law firm of McKeithen, McKeithen & Bohman, A.P.L.C. and serve as Liaison Counsel for the proposed Class in this matter.

2.      I submit this declaration in support of Plaintiffs' Motion for Class Certification.  I have personal knowledge of the matters set forth herein based upon my active participation in all material aspects of the prosecution of this litigation and, if called as a witness, am competent to testify thereto.

3.      Attached hereto as Exhibit A is a true and correct copy of the Table of Historical Trading Data for Amedisys common stock, from Yahoo/Finance.

4.      Attached hereto as Exhibit B is a true and correct copy of the firm biography of Stull Stull & Brody.

5.     Attached hereto as Exhibit C is a true and correct copy of the Keller Rohrback L.L.P. Complex Litigation Department resume.

6.     Attached hereto as Exhibit D is a true and correct copy of the McKeithen, McKeithen & Bohman, A.P.L.C. firm resume.

7.     Attached hereto as Exhibit E are true and correct copies of page excerpts of the Court transcript in the United Companies Securities Litigation, <u>Lasky v. J. Terrell Brown</u>, No. 99-CV-1035-D (M.D. La. 1999).

8.     Attached hereto as Exhibit F is a true and correct copy of the transcript of the August 26, 2002 deposition of Lead Plaintiff William J. Patterson.

9.     Attached hereto as Exhibit G is a true and correct copy of the transcript of the August 26, 2002 deposition of Lead Plaintiff Gordon D. Ellis, Jr.

I declare under penalty of perjury under the laws of the State of Louisiana that the foregoing is true and correct.

Executed this 19th day of February, 2003, at Baton Rouge, Louisiana.


_____
Marjorie A. McKeithen

2

## CERTIFICATE OF SERVICE

Pursuant to the Federal Rules of Civil Procedure, I hereby certify that a true and correct copy of this instrument has been forwarded to all counsel of record, via certified mail, return receipt requested, and/or via facsimile, and/or via U.S. Mail on this 19 day of February, 2003.

MARJORIE A. McKEITHEN

3